## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL GREEN,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **NO. 15-2646** |
| | : | |
| **POLICE OFFICER NEWTON** | : | |
| **BADGE NUMBER 130,** | : | |
| **Defendant** | : | |

### M E M O R A N D U M

**STENGEL, J.**                                                          **September  22, 2016**

Michael Green brings this civil rights action against Police Officer Newton of the SEPTA Police Department pursuant to 42 U.S.C. § 1983, alleging a violation of his constitutional rights under the Fourth Amendment[1] of the United States Constitution. Specifically, Mr. Green alleges that Officer Newton used excessive force during his arrest on May 13, 2013.  Officer Newton has filed a motion: (1) to strike the John Doe Defendants from this action; and (2) for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, or in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The plaintiff concedes to striking the John Doe Defendants but opposes the remainder of the motion.  Thus, I will strike the John Doe Defendants and dismiss the related Count II from this action.  For the following reasons, however, I will deny the remainder of the motion in its entirety.

---

[1]  The Fourth Amendment provides: The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.  AMEND. IV, US CONST.

## I.  LEGAL STANDARD

In determining to view this motion as one for summary judgment rather than one for judgment on the pleadings, I considered the legal standards for both types of motions. The standard for evaluating a motion for judgment on the pleadings pursuant to Rule 12(c) "is the same as the familiar standard used for evaluating a motion to dismiss under Rule (12)(b)(6)."  Accurso v. Infra-Red Servs., Inc., 23 F.Supp.3d 494, 499 (E.D. Pa. 2014).  Accordingly, "the distinction between a motion under 12(b)(6) and a motion under 12(c) 'is purely formal.'"  Id. (quoting Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990)).  When ruling on such a motion, the court must accept as true all factual allegations in the complaint and draw all inferences in the light most favorable to the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008); Umland v. Planco Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008).  The court must then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

If a party seeking judgment on the pleadings presents to the court "matters outside the pleadings," and the court does not exclude them, "the motion must be treated as one for summary judgment under Rule 56."  FED.R.CIV.P. 12(d).  If the court does so, the nonmoving party must receive "notice and an opportunity to oppose the motion."  Berry v. Klem, 283 F.App'x 1, 3-4 (3d Cir. 2008) (citing Hancock Indus. v. Schaeffer, 811 F.2d 225, 229 (3d Cir. 1987)).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A dispute is genuine for summary judgment purposes if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the plaintiffs. Id. at 252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Id.

When ruling on a motion for summary judgment, a court may only rely on admissible evidence.  See Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).  We view the facts and draw all inferences in favor of the nonmoving party.  In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

Here, the defendant relies on matters outside the pleadings which he has attached to his motion, including various depositions and medical records.  I will not exclude these exhibits, and thus will treat this motion as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  The notice to the plaintiff, however, is not necessary here because the plaintiff anticipated the possibility of the motion being

converted to one for summary judgment, and took the opportunity to oppose the motion by reviewing the defendant's exhibits.

## II. BACKGROUND

Mr. Green seeks compensatory and punitive damages for personal injuries he claims to have suffered during his arrest on May 13, 2013, by Officer Newton of the SEPTA Police Department.  There is no dispute that at the time of the incident, Mr. Green was waiting for a bus at Broad and Olney Streets in Philadelphia to take him and his two co-workers to work.  Officer Newton approached Mr. Green and told him that he was not permitted to loiter on that corner, and that he had to leave the area.  Mr. Green resisted leaving the area which prompted Officer Newton to initiate a PED investigation of Mr. Green.  That investigation revealed that Mr. Green had several unpaid parking tickets issued by the Philadelphia Parking Authority.  Officer Newton decided to place Mr. Green under arrest in order to transport him to Philadelphia's traffic court.  Mr. Green was also given a citation for disorderly conduct and loitering.[1]

Most of what happened during the arrest and thereafter is disputed by the parties, but both parties concede that at all times, Mr. Green was cooperative during the arrest. At his deposition, Mr. Green testified as follows:

> Q.    Okay.  After he put the handcuffs on you --
> actually, let's back up. When he put handcuffs on
> you, were you in anyway pulling away or did you
> just voluntarily put both arms behind your back?

---

[1] I note that after a hearing on August 13, 2013, the Honorable Nazario Jimines of the Municipal Court of Philadelphia found Mr. Green guilty of loitering only, and fined him $300 plus court costs.  See Exhibit D(2) at 18.

> A.    I voluntarily put both of my hands behind my
>        back.

<u>See</u> Exhibit D(1) at 27; Document #14-4 at 28.  Similarly, Officer Newton testified that

Mr. Green was cooperative at the time of the arrest:

> Q.    How did you handcuff him?
>
> A.    He -- he said whatever, he put his hands behind his
>        back, and I put the handcuffs on him. I never had
>        to grab him or nothing. He said, all right, well,
>        take me down there. He put his hands behind his
>        back, and I put the handcuffs on him.
>
> Q.    So he was cooperative with you?
>
> A.    Yeah.

<u>See</u> Exhibit C at 46; Document #14-3 at 47.

There is also no dispute regarding the minimum time the handcuffs were on Mr.

Green's wrists.  Officer Newton's logs reveal that he left the scene of the incident at 9:00

a.m., to transport Mr. Green to traffic court, and that he left traffic court at 10:00 a.m., to

transport Mr. Green to Hahnemann Hospital Emergency Room.  <u>See</u> Exhibit D(2).

Officer Newton testified that from the time he transported Mr. Green to traffic court, to

the time he left for Hahnemann Hospital Emergency Room, the handcuffs were never

removed from Mr. Green's wrists:

> Q.    And so even though his hand was too tight - - he
>        complained that the handcuffs were too tight. And
>        even though you were going to take him to the
>        hospital, you didn't loosen them at traffic court.  Is
>        that correct?
>
> A.    No, I didn't.

See Exhibit C at 56-57; Document #14-3 at 57-58.  Accordingly, there is no dispute that

the handcuffs were left on Mr. Green for approximately one hour.  At the hospital, Mr.

Green was diagnosed with a left wrist sprain, and was given pain medication.  See

Exhibit G.  His left wrist was placed in a wrist splint to restrict mobilization.  Id.  Mr.

Green was given instructions to follow-up with a hand specialist within two to three days.

An MRI of the left wrist performed on July 9, 2013, revealed degenerative osteoarthritic

changes at the left wrist primarily at the radiocarpal joint; with no evidence of internal

derangement, fracture, dislocation, or nerve damage.  See Exhibit F at 2.  Mr. Green

incurred $10,798.60 in related medical bills.

## III.  DISCUSSION

Mr. Green brought this action against the defendant pursuant to 42 U.S.C. § 1983,

alleging a violation of his Fourth Amendment rights.  Under 42 U.S.C. § 1983, a private

party may recover in an action against any person acting under the color of state law who

deprives the party of his or her constitutional rights.  Section 1983 provides in pertinent

part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or
> the District of Columbia subjects, or causes to be
> subjected, any citizen of the United States or other person
> . . . to the deprivation of any rights, privileges or
> immunities secured by the Constitution and law, shall be
> liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress.

Section 1983 does not by itself confer substantive rights, but instead provides a

remedy for redress when a constitutionally protected right has been violated.  Oklahoma

City v. Tuttle, 471 U.S. 808, 816 (1985).  Therefore, in order to succeed on a claim under

42 U.S.C. § 1983, a plaintiff must demonstrate: (1) the violation of a right secured by the

Constitution, and (2) that the constitutional deprivation was committed by a person acting

under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

Here, Officer Newton insists that as a police officer, he is entitled to judgment

because he is protected by qualified immunity.  Qualified immunity provides that police

officers and other government officials are immune from suits for civil damages under 42

U.S.C. § 1983 "insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Messerschmidt v.

Millender, 565 U.S. 535 (2012).  This doctrine attempts to balance the competing values

of protecting innocent individuals from litigation while allowing the imposition of

liability on those who abuse their discretion.  Harlow v. Fitzgerald, 457 U.S. 800, 814

(1982).  The qualified immunity analysis is specific to each individual defendant and

considers the totality of the circumstances at the time of the defendant's challenged

conduct.  Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007).

The qualified immunity inquiry is a question of law consisting of two prongs to be

considered in any order.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  The first

question is "whether the facts that a plaintiff has alleged or shown make out a violation of

a constitutional right."  Id. at 232.  The second inquiry asks "whether the right at issue

was 'clearly established' at the time of defendant's alleged misconduct."  Id.  A right is

clearly established if "it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted."  Reedy v. Evanson, 615 F.3d 197, 224 (3d Cir.

7

2010) (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001).  "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."  <u>Pearson</u>, 555 U.S. at 244.  The court must consider "the information within the officer's possession at that time."  <u>Harvey v. Plains Twp. Police Dep't</u>, 421 F.3d 185, 194 (3d Cir. 2005).  The defendant has the burden to establish that he is entitled to qualified immunity.  <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

"If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity."  <u>Bennett v. Murphy</u>, 274 F.3d 133, 136 (3d Cir. 2002).  If, however, a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established.  <u>Saucier</u>, 533 U.S. at 201.  If it would not have been clear to a reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity.  <u>Id.</u> at 202.

Here, the first inquiry on Officer Newton's claim of qualified immunity is whether the facts Mr. Green asserts, taken in the light most favorable to him, show that Officer Newton violated Mr. Green's Fourth Amendment rights.

Beyond its prohibition on unlawful seizures, the Fourth Amendment precludes the use of unreasonably excessive force in the context of an arrest or investigatory stop.  <u>Graham v. Connor</u>, 490 U.S. 386, 394 (1989); <u>see also</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198 (2004) (The use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness).

To state a claim for excessive police force under the Fourth Amendment, a plaintiff must show both that a seizure occurred and that it was unreasonable.[2]  See Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004).  To determine reasonableness, the court asks whether the officer's conduct was "objectively reasonable" in light of the totality of the facts and circumstances.  Id.  Factors for consideration may include whether a suspect posed "an immediate threat to the safety of the officers," whether the suspect was "actively resisting arrest or attempting to evade arrest by flight," or whether the suspect appeared to be violent.  See Graham, 490 U.S. at 396 (In making this determination, the court must evaluate the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, while recognizing that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation); Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997) (Additional factors for consideration include the possibility that the detainees are violent or dangerous, the duration of the action, whether the action occurs in the context of effecting an arrest, the possibility that the suspect is armed and the number of persons the officers must contend with at one time).  As the Supreme Court held:

> [T]he "reasonableness" inquiry in an excessive force case
> is an objective one: the question is whether the officer's
> actions are "objectively reasonable" in light of the facts
> and circumstances confronting [him], without regard to
> [his] underlying intent or motivation . . . .  An officer's

---

[2]  Here, the parties do not dispute that Mr. Green's arrest constituted a seizure.  Thus, the only issue on this inquiry is whether the force Officer Newton used to effect that seizure was reasonable.

> evil intentions will not make a Fourth Amendment
> violation out of an objectively reasonable use of force;
> nor will an officer's good intentions make an objectively
> unreasonable use of force constitutional.

Graham, 490 U.S. at 397.  Generally, Fourth Amendment reasonableness is a question for

the jury, but summary judgment may be appropriate under some circumstances.  See

Kopec, 361 F.3d at 777.

Careful attention must be given to the facts and circumstances of each particular

case, recognizing that the use of some coercion necessarily inheres in the officer's right

to make such an investigatory stop or seizure.  Graham, 490 U.S. at 396.  These facts and

circumstances include "the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight."  Id.

Here, the parties dispute several key facts surrounding Mr. Green's arrest which

render summary judgment inappropriate.  First, Officer Newton testified that Mr. Green

became agitated when asked to move away from the corner, and replied, "I ain't got to go

no fucking where.  I pay my taxes.  I'll leave when I'm ready to."  See Exhibit C at 35,

36; Document #14-3 at 36, 37.  Mr. Green also allegedly said, "You're a fucking SEPTA

cop.  You can't do nothing."  Id. at 37.  The defendant further testified that Mr. Green

was "causing a scene," and that a crowd was gathering.  Id.  He said, "Once the Plaintiff

started cursing and getting loud and boisterous with me, I called for backup."  Id. at 41.

The Incident Report, prepared by Officer Newton, characterized Mr. Green's conduct

prior to the arrest as "loud and boisterous . . . causing a crowd to gather," and his language as filled with "profanities towards police."  <u>See</u> Exhibit D(2) at 3.

On the other hand, Mr. Green insists that he was not cursing or causing a crowd to gather.  He testified that when first approached by Officer Newton and asked to move, Mr. Green and his co-workers complied, all going in different directions:

> A.   And then he asked me one more time, he said, if you'll (sic) don't leave, I'm taking y'all to the district.  And that's when all of us started -- us three, it was me and two co-workers, we both -- we all left different directions.  I went around towards Olney way.
>
>                            \*\*\*
>
> I never became loud, I never said, "fuck the police."  Crowd never gathered.  I can't see that, causing a crowd, and gathering and get [disorderly conduct] or something.

<u>See</u> Exhibit D(1) at 18, 31.  Even when read the allegations in Officer Newton's Incident Report, Mr. Green denied that he was boisterous, loud, or used profanity when talking to Officer Newton.  <u>Id.</u>

After Mr. Green began moving away, Officer Newton followed him, and said to Mr. Green, "I see you going to that bus like I told you to."  Mr. Green replied, "I'm not going to no bus like you told me to.  I said, I'm moving away from you because you're not making sense.  You're telling me to move for no reason."  <u>Id.</u>  Officer Newton then said, "you say one more thing, I'm locking you up."  In response, Mr. Green said, "come on, Officer, come on and lock me up because today you must be having a bad day.  And that's when he came and did what he did."  <u>Id.</u> at 19.  It was at that point that Officer

Newton conducted the PED investigation, and found out that Mr. Green had an outstanding warrant for unpaid parking tickets.

Second, Mr. Green insists that Officer Newton deliberately and gratuitously twisted Mr. Green's left wrist even though Mr. Green had voluntarily placed his hands behind his back to be handcuffed:

> Q.   Okay. After he put the handcuffs on you -- actually, let's back up.  When he put handcuffs on you, were you in anyway pulling away or did you just voluntarily put both arms behind your back?

> A.   I voluntarily put both of my hands behind my back.  He came over.  He grabbed my -- he twisted my wrist.  And then he put the handcuffs on tight.  And I heard a -- like a knuckle crack when he did it.

> Q.   So you're - so I'm clear, you -- after you said, go ahead and lock me up then, he didn't have to touch you, you just put both arms behind your back?

> A.   Yes.

> Q.   And he only touched you when he went to put the handcuffs on your wrists, correct?

> A.   Yes.

> Q.   If you remember, it's two years ago, three years ago now, when he put the handcuffs on your wrist, do you know whether or not he put the left handcuff on or the right handcuff on first?

> A.   It was the left handcuff.

> Q.   So he put the left handcuff on first, and that's when you say you heard a crack?

> A.   Like a knuckle, You know how you have a crack (indicating), like that noise.
>
> Q.   So I'm trying to understand.  So if your hands are already behind your back—
>
> A.   Yes.
>
> Q.   -- were they -- just for the record, were they already out with both palms facing out --
>
> A.   Yes.
>
> Q.   But at some point you say that he grabbed your left wrist and it twisted?
>
> A.   Yes.
>
> Q.   And did you hear the crack when he twisted it or when he put the handcuffs on?
>
> A.   When he twisted it.
>
> Q.   So when he put the handcuffs on, you indicated that he put them on tight?
>
> A.   Yes.
>
> Q.   What do you mean by that?
>
> A.   Tight, it was hurting. . . .  I had throbbing.

See Exhibit D(1) at 28-29.

Officer Newton denies twisting Mr. Green's left wrist at any time during the arrest and handcuffing process:

> Q.   And did you twist his -- either of his arms when you were putting handcuffs on him?
>
> A.   No.

<u>See</u> Exhibit C at 47.

 Third, Mr. Green testified that Officer Newton placed the handcuffs on him too tightly and ignored his repeated pleas to loosen them.  This alleged failure to respond by loosing the handcuffs caused Mr. Green to suffer during the entire time the handcuffs were on his wrists, which was approximately one hour.  Mr. Green testified that he had complained to Officer Newton about the handcuffs being too tight at least three times. Mr. Green said that he knew immediately that Officer Newton had applied the handcuffs too tightly, so he asked Officer Newton to loosen them, but Officer Newton neither checked them, nor made any adjustment.  <u>See</u> Exhibit D(1) at 35.  Mr. Green testified:

> I said my arm hurting can you please loosen these handcuffs.   [Officer Newton] said you should have thought about that before you started running your mouth.

<u>Id.</u>  In a signed statement dated October 28, 2013, co-worker Leonard "Butchie" Stone, who witnessed the arrest, indicated that he had heard Mr. Green complain "to the SEPTA Police Officer that the handcuffs were too tight and hurting his wrists.  The SEPTA Police Officer made no adjustment to the handcuffs on Michael Green."  <u>See</u> Stone Affidavit, Exhibit D(2) at 21.

 Mr. Green also testified that he complained about the handcuffs being too tight while in the van.  Specifically, he testified, "I got in the van, and we was riding, and I'm screaming, 'can you please take these -- come get these, take these handcuffs off me,' and he kept riding." <u>See</u> Exhibit D(1) at 35.  Mr. Green testified that, despite repeatedly screaming out his pleas during the drive to traffic court, Officer Newton never loosened

the handcuffs.  Finally, Mr. Green informed Officer Newton that the handcuffs were too tight when they arrived in the parking lot at traffic court.

Mr. Green further testified that a back-up SEPTA police officer physically took him inside traffic court while Officer Newton was still outside.  See Exhibit D(1) at 36. Mr. Green said that when the Sheriff on duty at traffic court loosened the handcuffs, he "felt this pain going straight up [his] arm."  Id.  Immediately thereafter, Mr. Green's left wrist began to shake, which prompted the Sheriff to tell the SEPTA Officer, "this guy can't stay in here like that.  Y'all got to take this guy to the hospital."  Id. at 36-37.

To the contrary, Officer Newton testified that Mr. Green only complained about the handcuffs being too tight once, that is, when they arrived at traffic court.  At that point, Officer Newton checked the handcuffs and determined they were not too tight.  He then took Mr. Green to the Hahnemann Hospital Emergency Room.  See Exhibit C.

Despite these disputed facts, I also note the absence of circumstances which may have warranted Officer Newton's conduct.  Officer Newton never indicated a belief that Mr. Green had committed a serious crime or violation other than the unpaid parking tickets.  Officer Newton further did not suggest that Mr. Green posed an immediate threat to the officer's safety or to the safety of anyone in the vicinity.  Officer Newton was not in the midst of a dangerous situation involving a serious crime or armed criminals.  In fact, Officer Newton testified that Mr. Green was fully cooperative during the arrest.

Accordingly, under the first prong of the qualified immunity analysis, Mr. Green has set forth sufficient facts to raise a material question of fact with respect to whether Officer Newton violated his Fourth Amendment constitutional rights.  Kopec, 361 F.3d at

777 (the use of excessively tight handcuffs on an arrestee and the failure to respond to pleas to loosen them can constitute excessive force).  Where, as here, a plaintiff alleges actual injury inflicted by a police officer in the course of an arrest, and supports his allegation with specific facts so that it cannot be said as a matter of law that the use of force was objectively reasonable, the issue of whether excessive force was employed must be left to the trier of fact.

Regarding the second prong of the qualified immunity analysis, the right of an arrestee to be free from the use of excessive force in the course of his handcuffing is clearly established, and "a reasonable officer would have known that employing excessive force in the course of handcuffing would violate the Fourth Amendment." Kopec, 361 F.3d at 778; see also Clifton v. Borough of Eddystone, 824 F.Supp.2d 617, 631 (E.D. Pa. 2011) (The right to be free from the use of excessive force in the course of handcuffing is clearly established and is not defeated by qualified immunity).  This principle is particularly true where, as here, the police officer does not claim that the plaintiff posed any threat, failed to comply with instructions, resisted arrest, committed a serious crime, appeared to be armed, or attempted to flee.  Accordingly, I will not grant summary judgment in favor of Officer Newton on the basis of qualified immunity.

An appropriate Order follows.